## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JENNIFER SMITH,

     Plaintiff,

v.                                                                                  Civ. No. 20-591 GJF/LF

STATE OF NEW MEXICO, *et al.*,

     Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court upon Defendants State of New Mexico Corrections Department ("NMCD") and Marianna Vigil's (collectively, "State Defendants") "Motion to Dismiss Count V of Complaint" [ECF 8] ("Motion"). The Motion is fully briefed. *See* ECF 17 (Response); ECF 19 (Reply). While the Motion was pending, Plaintiff filed her First Amended Complaint on October 14, 2020. ECF 46. Consequently, the Court ordered additional briefing to "address whether and how the new allegations" in Plaintiff's amended complaint "should affect the Court's analysis of the Motion." *See* ECF 48 (Order); ECF 49 (Plaintiff's supplemental brief); ECF 55 (State Defendants' supplemental brief). On October 26, 2020, the parties stipulated "that the pending Motion . . ., along with Plaintiff's Response to the Motion . . ., the State's Reply Brief . . . and the court-ordered supplemental briefs, shall apply to Plaintiff's First Amended Complaint." ECF 50 at 1–2.  For the reasons stated below, the Court will **GRANT** State Defendants' Motion and **DISMISS** Count V **WITH PREJUDICE**.

## I.   BACKGROUND[1]

In 2018, Plaintiff was incarcerated at the Springer Correctional Center ("SCC"), which exclusively housed women inmates. ECF 46 ¶ 3. While there, Plaintiff worked as a barber to staff and other inmates. *Id.* ¶ 17. During that time, Defendant Richard Whited worked in the SCC's business office. *Id.* ¶ 18. In that position, Defendant Whited also performed duties in the mailroom. *Id.* ¶¶ 19–20.

Upon meeting Plaintiff, Defendant Whited commented that her hair was "angelic." *Id.* ¶ 21. Later, he began visiting Plaintiff for "haircuts more frequently than needed." *Id.* ¶¶ 25, 39. Defendant Whited, who had plenary access to letters sent to and received by prisoners, also began sending letters to Plaintiff expressing his romantic interest in her. *Id.* ¶¶ 20, 26–31. For her part, Plaintiff never replied to any of his letters. *Id.* ¶ 33. But she did save at least some of Defendant Whited's letters. *Id.* ¶¶ 37, 57, 61.

The event that gave rise to the present litigation happened on a day on which Defendant Whited visited Plaintiff for a haircut. *Id.* ¶ 46. After the haircut, Plaintiff entered a supply closet to put away her supplies. *Id.* ¶ 47. Defendant Whited followed Plaintiff into the closet and "forcibly kissed" her and "touched her breast and buttocks." *Id.* ¶¶ 49, 50. When Plaintiff tried to escape, Defendant Whited "pulled her back towards him and pressed his penis against her buttocks." *Id.* ¶¶ 51, 52.

Plaintiff sued Defendant Whited, the NMCD, and Defendant Vigil who was serving as the SCC's warden when the alleged events occurred. *Id.* ¶¶ 4–10. Because Defendant Whited's direct supervisor was on paid administrative leave, Defendant Vigil acted as his most direct supervisor. *Id.* ¶¶ 11, 70–72. Invoking the New Mexico Tort Claims Act ("NMTCA"), Count V of Plaintiff's

---

[1] The following facts are taken directly from Plaintiff's First Amended Complaint [ECF 46]. For the purposes of this Motion, the Court accepts all of Plaintiff's factual allegations as true.

amended complaint alleges that each defendant was negligent in their "operation or maintenance" of the SCC. *Id.* ¶¶ 108–115. In the instant Motion, the NMCD and Defendant Vigil seek dismissal with prejudice of Count V (the only count brought against State Defendants) for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). These defendants argue that Plaintiff's claim against them is barred by sovereign immunity under the NMTCA. ECF 8 at 1.

## II.   ISSUE

The parties agree that the single issue before the Court is whether the NMTCA waives sovereign immunity as to Count V of Plaintiff's amended complaint. *See* ECF 8 at 1; ECF 17 at 4 ("At issue is whether the waiver of immunity pursuant to Section 41-4-6 applies to the facts as pleaded in [Plaintiff's First Amended Complaint].").

## III.   ANALYSIS

### A.   Parties' Arguments

State Defendants posit that Count V is barred by sovereign immunity under the NMTCA. ECF 8 at 7. They further argue that the waiver of immunity set forth in Section 41-4-6 N.M.S.A. does not apply. *Id.*[2] State Defendants identify two categories of claims to which Section 41-4-6 does not attach: (1) claims alleging negligent supervision, and (2) claims alleging negligence in performing administrative functions related to the operation of a prison. ECF 8 at 9–11. Because Plaintiff's claim falls into both of those categories, the Court should conclude that sovereign immunity has not been waived. *Id.*

---

[2] Section 41-4-6 waives sovereign immunity for injuries "caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. § 41-4-6(A).

In response, Plaintiff avers that "[t]he distinction between a singular act of negligent supervision that puts one person at risk and one that puts all of those who occupy the building at a risk, is no different than requiring more than just a single administrative act by a prison employee that put a single individual at risk." ECF 17 at 6. Accordingly, the question before the Court is not whether Plaintiff's claim falls into one of the two categories identified by State Defendants, but rather whether the SCC was operated in a manner that "create[d] a risk to all those in the prison." *Id.* Because the facts alleged plausibly show that State Defendants' conduct presented a risk of harm to every inmate at the SCC—not Plaintiff alone—her claim falls within the scope of the waiver in Section 41-4-6. *Id.*

In support of her argument, Plaintiff directs the Court's attention to five allegations that she says reflect "a myriad of alleged conduct that created a dangerous condition to female inmates, placing them at a high risk of sexual assault." ECF 17 at 11; ECF 46 ¶ 15. First, "SCC was understaffed, resulting in a high inmate to staff ratio." ECF 17 at 7; ECF 46 ¶ 12. Second, female inmates are left in the "care and custody of mostly male corrections officers and other male staff." ECF 17 at 7; ECF 46 ¶ 13. Third, "a large number of areas in SCC were not monitored by cameras." ECF 17 at 10; ECF 1-1 ¶ 14. Fourth, the NMCD had a policy or custom of punishing inmates who made complaints under the Prison Rape Elimination Act ("PREA")[3] that were found to be unsubstantiated. ECF 17 at 7–10; ECF 46 ¶¶ 33–36. Fifth, State Defendants "failed to oversee and supervise Defendant Whited's activities to ensure he did not use his access to the mailroom and

---

[3] Broadly, the Prison Rape Elimination Act (commonly abbreviated as "PREA") was enacted to establish "a zero-tolerance standard for . . . prison rape." 34 U.S.C. § 30302(1). Under PREA's accompanying regulations, a correctional facility must "provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment, retaliation by other inmates or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents." 28 C.F.R. § 115.51(a).

his position at SCC to sexually harass and assault inmates." ECF 17 at 3, 10–11 (citing ECF 1-1 ¶¶ 22, 28, 29, 72).

In her supplemental briefing, Plaintiff argues that because Defendant Whited's supervisor was on administrative leave (and a replacement was not hired), Defendant Whited was "essentially unsupervised" during the events leading up to the alleged assault. ECF 49 at 2–3. Plaintiff contends that "[i]t is common knowledge that an employee without a supervisor . . . may commit malfeasance," and the unsupervised Defendant Whited therefore posed a danger "to all female inmates in the facility with whom [he] had access." ECF 49 at 3–4. For their part, State Defendants contend that "[t]he new allegations . . . amount to nothing more than an alleged administrative failure (to hire a replacement supervisor for the business office while the incumbent was away on leave) and negligent supervision," both of which are not covered by Section 41-4-6. ECF 55 at 2.

## B. Substantive Law

### 1. Standard of Review

It is axiomatic that a district court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under this standard, the Court must accept all well-pled factual allegations as true and construe those facts in the light most favorable to the non-moving party. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). But the Court need not accept legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be "plausible," the allegations underlying the claim cannot be "so general that they encompass a wide swath of conduct, much of it innocent."

*Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). And the "mere metaphysical possibility" that the plaintiff "could prove *some* set of facts" in support of her claims will not suffice—the complaint must instead give the court reason to believe that "*this* plaintiff has a reasonable likelihood of mustering factual support" for her claims. *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

### 2.   New Mexico Tort Claims Act

Under the NMTCA, state governmental entities and public employees acting in the scope of their official duties enjoy sovereign immunity, unless it is expressly waived. N.M. Stat. § 41-4-4(A); *see also Roybal-Mack v. New Mexico Dep't Pub. Safety*, No. 17-CV-552-WJ-KK, 2017 WL 3025921, at *2 (D.N.M. July 11, 2017) (stating that the NMTCA "preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties, except as specifically waived."). The NMTCA is the "exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived." N.M. Stat. § 41-4-17(A). Furthermore, for this Court to have jurisdiction over Plaintiff's claim, it must first conclude that a waiver of sovereign immunity applies. *See Spray v. City of Albuquerque*, 608 P.2d 511, 513 (N.M. 1980) ("We hold that the issue of governmental immunity is jurisdictional in nature").

Section 41-4-6 waives immunity for liability "caused by the negligence of public employees while acting within the scope of their duties in the *operation* or *maintenance* of any building, public park, machinery, equipment or furnishings." N.M. Stat. § 41-4-6(A) (emphasis added). Section 41-4-6 incorporates traditional concepts of premises liability found in New Mexico common law. *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 616 (N.M. 2013). Put

differently, "the facts of a case will support a waiver under Section 41-4-6(A) if they would support a finding of liability against a private property owner." *Id.* at 618. For a waiver of immunity to occur under Section 41-4-6, a defendant's "negligent 'operation or maintenance' must create a *dangerous condition* that threatens the general public or a class of users" on the property in question. *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006) (emphasis added). Such a "dangerous condition" need not be a physical defect. *Id.*

New Mexico courts strictly construe "[s]tatutory provisions purporting to waive governmental immunity." *Rutherford v. Chaves County*, 69 P.3d 1199, 1202 (N.M. 2003); *see also Kreutzer v. Aldo Leopold High School*, 409 P.3d 930, 941 (N.M. Ct. App. 2017) ("Caution is warranted given that exceptions to the [NMTCA]'s general rule of immunity are strictly construed."). In passing the NMTCA, the New Mexico Legislature recognized the "inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. § 41-4-2(A). But, at the same time, the legislature recognized that "the area within which the government has the power to act for the public good is almost without limit, and therefore the government should not have the duty to do everything that might be done." *Id.*

New Mexico appellate courts have expounded on the contours of Section 41-4-6 in a number of important cases. In *Archibeque v. Moya*, Archibeque was a prisoner at Central New Mexico Correctional Facility before being transferred to the New Mexico State Penitentiary. 866 P.2d 344, 346 (N.M 1993). Before being released into the general prison population, Archibeque met with Moya-Martinez, a prison intake officer, to discuss whether Archibeque knew of any enemies he might have at the penitentiary. *Id.* After identifying an enemy, Archibeque was told that the man identified was no longer at the penitentiary. *Id.* Shortly after being released into the general population, Archibeque was attacked by the man he earlier identified. *Id.*

The New Mexico Supreme Court ultimately did "not agree with Archibeque that immunity [wa]s waived under Section 41-4-6." *Id.* at 347. In so deciding, the court began with the proposition that "the 'operation' and 'maintenance' of the penitentiary premises . . . does not include the security, custody, and classification of inmates." *Id.* The court reasoned that Moya-Martinez, in releasing Archibeque into the general prison population, performed an "administrative function," which is not the "operation" or "maintenance" of "the prison's physical premises." *Id.* The court noted that because the plain language of Section 41-4-6 does not waive immunity for the negligent performance of administrative functions, reading Section 41-4-6 to do so would conflict with the waiver's plain language. *Id.* And, importantly, the court further observed that while Moya-Martinez's actions put Archibeque at risk, her negligence did not put the rest of the prison population at risk. *Id.*

Later, in *Callaway v. New Mexico Department of Corrections*, the New Mexico Court of Appeals also had an opportunity to address the application of Section 41-4-6 in the prison context. 875 P.2d 393 (N.M. Ct. App. 1994). There, Callaway was sentenced to a term in the state penitentiary. *Id.* at 395. Shortly after arriving, he was attacked by three other inmates in a recreation room. *Id.* The assailants "were known gang members with a prior history of violence against other inmates." *Id.* In addition, the recreation room had several areas "shielded from direct observation by . . . officers," and contained "potential weapons such as weight bars and pool cues." *Id.* Callaway argued that the defendants were not protected by sovereign immunity under Section 41-4-6 because they "were negligent in allowing known, dangerous gang members to roam loose among the prison population." *Id.* at 397.

In its discussion, the Court of Appeals distinguished the facts at hand from those in *Archibeque*. *Id.* at 399. In *Archibeque*, the court noted, Moya-Martinez's negligence put only

Archibeque at risk. *Id.* In contrast, in the case before it, the defendants "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." *Id.* Because the recreation room posed a danger to the entire prison population and not just Callaway, the court held "that the trial court erred in dismissing [Callaway's] complaint for failure to state a claim under Section 41-4-6." *Id.*

*Espinoza v. Town of Taos* provides additional insight. There, the Espinozas enrolled their son, Valentine, in a summer day camp. 905 P.2d 718, 719 (N.M. 1995). One day, the children of the camp were gathered at a playground, waiting for their parents to pick them up. *Id.* As the children waited, Valentine tried to climb up the face of one of the playground slides, instead of using its steps, and injured himself when he tried to turn around to go down the slide. *Id*. Although program policy required an on-site supervisor and three other employees to watch the children, only two employees (and no supervisor) were present. *Id.*

The district court rejected the Espinozas' "contention that the absence of adequate supervision was a dangerous 'condition' of the playground for which sovereign immunity had been waived." *Id.* at 720. The court noted, that for Section 41-4-6 to apply, the negligent conduct in dispute must itself create an unsafe condition to the public. *Id.* at 721–22. Because a playground does not generally require supervision, the alleged failure to supervise did not create a danger to the public, instead presenting a danger only to Valentine. *Id.* at 722. Consequently, the court held that sovereign immunity under these circumstances had not been waived. *Id.*

More recently, the New Mexico Supreme Court has had two opportunities to discuss the application of Section 41-4-6 at length. In *Upton v. Clovis Municipal School District*, the Uptons

were parents to a daughter with asthma and informed her school of her condition. 141 P.3d 1259,

1263 (N.M. 2006). Despite the school being on notice of her condition, a substitute teacher for the

daughter's physical education class required her one day to perform strenuous exercise. *Id.* The

daughter had difficulty breathing and asked the teacher to be allowed to stop. *Id.* The teacher

refused. *Id.* Later that day, the daughter collapsed at her desk and eventually died after school

personnel failed to follow emergency protocol, timely call 911, or administer cardiopulmonary

resuscitation. *Id.*

The Uptons sued the school district, arguing that its negligence constituted a "dangerous

condition." *Id.* at 1261–62. Relying on *Espinoza*, the school district responded that it was protected

by sovereign immunity because the parents merely alleged negligent supervision. *Id.* at 1263; *see*

*generally Espinoza*, 905 P.2d at 921. Both the district court and the New Mexico Court of Appeals

agreed with the school district. 141 P.3d at 1260. On review, the New Mexico Supreme Court

clarified that its decision in *Espinoza* rested on two grounds. First, the court observed that the

Espinozas claimed *only* negligent supervision. *Upton*, 141 P.3d at 1263. Second, the court noted

that *Espinoza* emphasized that the NMTCA "does not waive immunity for a single, discrete

administrative decision affecting only a single person, as opposed to a dangerous condition

affecting the general public." *Id.*

The court determined that, unlike the Espinozas, the Uptons claimed "much more than

negligent supervision of their daughter." *Id.* at 1263–64. The court noted that although the Uptons'

claim contained elements of negligent supervision, what they ultimately argued was that the school

district "negligently put in motion a chain of events" leading to the death of their daughter:

> The school failed . . . to respond appropriately to the specific information it was
> given about [the daughter's] condition, and to implement the specific assurances
> given to the Uptons about the care the school was to provide in light of [the
> daughter's] special needs. The substitute teacher, a school employee, forced [the

> daughter] to continue her exercise despite tangible evidence of her distress. Then,
> the school failed to properly implement its emergency procedures. Faced with [the
> daughter's] acute distress, the school never administered CPR, no one called 911
> in a timely manner, [the daughter] was simply wheeled outside to await emergency
> personnel. Thus, the Uptons challenge far more than a single failure of oversight
> by one overworked teacher.

*Id.* at 1263–64.

Because the same policies (or lack thereof) that led to the death of the Uptons' daughter were also in place for other students, the court reasoned that the school's negligence put every other student at risk. *Id.* at 1264–65. As a result, the court held that "the school's failures . . . created a dangerous condition for all special-needs children, and with regard to emergency responsiveness, for every student at the school." *Id.* at 1265. It was upon that basis that the court held that "the Uptons have stated claim which, . . . constitutes negligence in the operation or maintenance of a building within the waiver of tort immunity set forth in Section 41-4-6." *Id.*

The New Mexico Supreme Court's most recent treatment of the scope of Section 41-4-6 occurred in *Encinias v. Whitener Law Firm, P.A.* Encinias was badly beaten by one or more of his classmates on a street adjacent to his school where students patronized food trucks. 310 P.3d 611, 614–15 (N.M. 2013). Encinias and his parents retained a law firm to sue the school. *Id.* But the firm allowed the statute of limitations to lapse without ever filing suit. *Id.* at 615. Encinias sued the firm for legal malpractice. *Id.* In New Mexico, "[t]he elements of legal malpractice are: '(1) the employment of the defendant attorney; (2) the defendant attorney's neglect of a reasonable duty; and (3) the negligence resulted in and was the proximate cause of loss to the [client].'" *Id.* at 616 (quoting *Sharts v. Natelson*, 885 P.2d 642 (N.M. 1994)). Because only the third element— loss to the client—was before it, the court addressed whether Encinias could have prevailed on his underlying claim. *Id.* In doing so, the court relied on an affidavit from the assistant principal stating that the street on which Encinias was attacked had historically been known to school personnel as

a "hot zone" for student-on-student violence. *Id.* at 617–18. The court held that "a school's failure to address a *pattern* of student violence in a particular area might create an unsafe condition on the premises" for which immunity under Section 41-4-6(A) could have been waived. *Id.* (emphasis added).

### C.  Section 41-4-6 Does Not Waive Immunity for Count V

It is important to remember that waivers of sovereign immunity must be construed narrowly. *Rutherford*, 69 P.3d at 1202. This admonition restrains whatever impulse the Court might feel to infuse additional elasticity into the waiver language that neither the New Mexico Legislature nor the New Mexico appellate courts have heretofore infused. Because Plaintiff has failed to allege facts indicating that State Defendants had any sort of notice (actual or constructive) of the alleged danger posed to SCC inmates, Plaintiff has failed to plead facts plausibly showing that Section 41-4-6 permits her claim.

> 1.  Plaintiff Has Not Alleged that State Defendants Knew or Should Have Known of a Dangerous Condition

Underlying the decisions of New Mexico appellate courts is a persistent and recurrent principle—for waiver to apply under Section 41-4-6, the government, prior to the disputed injury, must have known or should have known of the alleged dangerous condition that threatened the public or a class of users. *See, e.g.*, *Encinias*, 310 P.3d at 619; *Upton*, 141 P.3d at 1262 ("Safety procedures are particularly vital for those students *known* to have special needs and special risks.") (emphasis added); *Castillo v. Santa Fe County*, 755 P.2d 48, 50 (N.M. 1988) ("Under the allegations of her complaint, it appears that Castillo could prove that the Housing Authority was *aware or should have been aware* of the continuing problem of loose-running dogs and the resulting danger this condition posed for the common area of Valle Vista which the Housing Authority had the duty to maintain in a safe condition.") (emphasis added); *Kreutzer*, 409 P.3d at

943 ("*Encinias* thus distinguished a negligent supervision case, as in a single student-on-student altercation, from a case in which there is evidence of a *prior history of violence* that the defendant, in the exercise of ordinary care, *reasonably could have discovered* and acted upon to prevent injury to the plaintiff.") (emphasis added); *Callaway*, 875 P.2d at 399 ("[W]e hold that Plaintiff has stated a claim sufficient to waive immunity under Section 41-4-6 because Defendants *knew* or *should have known* that roaming gang members with a *known* propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was *foreseeable.*") (emphasis added).

Likewise, this District has interpreted Section 41-4-6 to require some evidence of notice. *Thorn-Freeman v. Valdez*, Civ. No. 20-448 JAP/GJF, 2020 WL 5369063, at *10 (D.N.M. Sept. 4, 2020) ("*Callaway* and *Encinias* also reinforce the need for some sort of *notice* (actual or constructive) prior to the underlying incident to state a plausible failure to supervise claim under § 41-4-6.") (emphasis added); *Green v. Padilla*, No. CIV 19-0751 JB\JFR, 2020 WL 5350175, at *30 (D.N.M. Sept. 4, 2020) ("New Mexico's courts also have required that, for § 41-4-6's waiver to apply, the public employees *knew or should have known* of the danger posed by the condition.") (emphasis added).

Plaintiff's failure to plausibly allege that State Defendants had notice is fatal to Count V. The only fact pattern in the prison context in which a New Mexico appellate court has held sovereign immunity to be waived under Section 41-4-6 was in *Callaway*. The instant case before this Court is qualitatively different. In *Callaway*, the New Mexico Court of Appeals reasoned that *known* gang members who had a *known* "propensity for violence" located in a room containing potential weapons and areas obscured from correctional officer view could constitute a dangerous

condition. 875 P.3d at 399. In contrast, Plaintiff does not allege that Defendant Whited had a known reputation for engaging in sexual misconduct. Indeed, the First Amended Complaint includes no allegations that Defendant Whited has ever engaged in prior improper behavior of any kind. Moreover, the First Amended Complaint is silent on any other staff member—male or female—on or off camera victimizing any other inmate at any prior time. Plaintiff's case is therefore wholly different from *Callaway* because Plaintiff has not alleged facts showing that State Defendants had any sort of notice (actual or constructive) of the alleged danger posed by Defendant Whited or SCC staff generally. Consequently, Plaintiff has alleged insufficient facts to make a plausible claim that sovereign immunity is waived under Section 41-4-6.

### 2.   Plaintiff Has Not Alleged a Dangerous Condition that Threatened the General Prison Population

Count V suffers from another infirmity: Plaintiff has also not alleged facts demonstrating that a dangerous condition threatened the general prison population at the SCC. In *Archibeque*, the New Mexico Supreme Court reasoned that while the prison's misclassification of Archibeque created a risk to him, the misclassification did not put the "general prison population" at risk. 866 P.2d at 348. That distinction proved dispositive, as the Supreme Court held that Section 41-4-6 did not apply. *Id.* In so holding, the Court opined that interpreting Section 41-4-6 "to waive immunity every time a public employee's negligence creates a risk of harm for a *single individual* would subvert the purpose of the [NMTCA]." *Id.* (emphasis added). Put simply, for Section 41-4-6 to apply, the risk alleged must be posed to a group or class of people on government property. *See id.* Applying that rule to this case, the Court notes that Plaintiff does not allege that Defendant Whited, himself, posed a risk to any other SCC inmate. Thus, Defendant Whited cannot qualify as a dangerous condition within the meaning of Section 41-4-6 because the facts alleged demonstrate that he only put Plaintiff at risk.

The Court next addresses whether Plaintiff's allegations about negligent supervision, PREA reporting, and prison staffing amount to a dangerous condition. Plaintiff makes allegations that suggest that negligent supervision created a dangerous condition: (1) the SCC was not adequately monitored by camera, (2) State Defendants failed to supervise Defendant Whited's mailroom activities, and (3) Defendant Vigil failed to either appoint a replacement supervisor or adequately supervise Defendant Whited herself while his direct supervisor was on leave. ECF 17 at 2–3, 10; ECF 49 at 2–3. New Mexico appellate courts have made clear that, for a lack of adequate supervision to provide a basis for waiver under Section 41-4-6, a plaintiff must show that the premises in question cannot be operated safely without it. On this point, *Espinoza* is the leading case. There, the New Mexico Supreme Court concluded that a summer camp's failure to supervise a child on a playground did not constitute a dangerous condition because a playground can be operated safely without supervision. 905 P.2d at 722. The converse is also true. In *Leithead v. City of Santa Fe*, 940 P.2d 459, 463 (N.M. Ct. App. 1997), the New Mexico Court of Appeals held that a public swimming pool's failure to adequately provide lifeguard services constituted a dangerous condition because

> [a] swimming pool without an adequate number of trained lifeguards creates a dangerous condition on the physical premises which affects the swimming public at large. In fact, lifeguard services *are so essential* to the safety of a swimming pool that they seem akin to other kinds of safety equipment, such as lifelines and ladders, that are *fundamental* in making the premises reasonably safe for the swimming public.

(emphasis added). Like *Espinoza* and unlike *Leithead*, Plaintiff has not alleged that supervision is *essential* to safe interactions between SCC staff and inmates. Absent such allegations, Plaintiff's supervisory allegations fall short of plausibly alleging a dangerous condition.[4]

---

[4] The allegations and related arguments brought by Plaintiff in her First Amended Complaint [ECF 46 ¶¶ 70–72] and her associated supplemental briefing [ECF 49 at 3] do little to change the calculus of the Court's decision. The Court agrees with State Defendants' assessment—these allegations sound in negligent supervision. ECF 55 at 2. Under

Plaintiff next argues that the State Defendants' failure to either follow or implement certain safety policies created a dangerous condition. *See* ECF 17 at 7–10.[5] For this point, Plaintiff relies on *Upton* and *Baca v. State*, 911 P.2d 1199 (N.M. Ct. App. 1996). As discussed *supra*, *Upton* held that a school's failure to appropriately respond to a student's physical distress created a dangerous condition because the "school's indifference towards" the Uptons' daughter's "special medical needs ma[de] it more likely that all similarly situated students were at risk as well." 141 P.3d at 1265. In other words, because the school's failure to follow policy caused (at least to some degree) the death of the Upton's daughter, it was plausible that the school would respond likewise to another student's health crisis, thereby placing every student at risk. *See id.*

In contrast, Plaintiff's allegations do not make it plausible that the SCC's alleged policy defects caused her injuries. Plaintiff insists that she did not report Defendant Whited's behavior because she feared retaliation. ECF 17 at 7–8. But the facts alleged run counter to her narrative. Taken as true, the First Amended Complaint alleges that State Defendants retaliated only against inmates who levied *unsubstantiated* PREA complaints. ECF 46 ¶¶ 33–36. Such a policy deters only those PREA complaints that are false, malicious, or lacking in a factual basis. And Plaintiff, by maintaining control over some of the letters sent by Defendant Whited, *could have* substantiated a complaint. *See id.* ¶¶ 37, 57, 61. Likewise, Plaintiff has not alleged facts showing that the SCC's

---

*Espinoza*, Plaintiff must have alleged that there is something inherently dangerous about SCC staff interactions with inmates such that they cannot occur safely unless supervised. *See* 905 P.2d at 722. Although Plaintiff has argued that unsupervised employees generally tend to "commit malfeasance" [ECF 49 at 3]—she has not made such allegations in her First Amended Complaint. *See* ECF 46. Put simply, whether someone was or was not supervised is irrelevant to the question of whether Section 41-4-6 applies if the underlying activity does not require supervision. Because Plaintiff does not allege that SCC staff *cannot* safely interact with inmates without supervision, her new allegations do not bring her claim within Section 41-4-6's waiver provision.

[5] Specifically, Plaintiff points to State Defendants' alleged retaliatory PREA policy, failure to adequately staff the SCC, and employment of a high ratio of male over female staff members. *See* ECF 17 at 7–10; *see also* ECF 46 ¶¶ 12–13, 33–36.

staffing conditions caused the assault. There is simply nothing in Plaintiff's allegations about overall understaffing or in the male-to-female imbalance that converts those allegations into a plausible claim of a dangerous condition under Section 41-4-6. Because Plaintiff has not alleged facts showing that State Defendants' policy failures caused her injury, Plaintiff's policy allegations are distinguishable from *Upton* and do not bring her claim within Section 41-4-6.[6]

*Baca* does not compel a different result. There, a horse trainer was injured while being removed from the New Mexico State Fair parking lot. *Baca*, 911 P.2d at 1200. The trainer had a permit allowing him to park for free. *Id.* When the trainer parked without paying, however, a state fair employee alerted security guards to eject him. *Id.* An altercation ensued, during which the trainer was injured. *Id.* Under state fair policy, security guards did not have discretion to question ejectment decisions. *Id.* As a result, the guards did not investigate whether the trainer was required to pay for parking. *Id.* The New Mexico Court of Appeals held that the state fair's policy provided a basis for waiver under Section 41-4-6 because a "security force without discretion was an altercation waiting to happen, a condition on the premises that was a danger to any person who might expect to be treated with respect and dignity." *Id.* at 1201. The policy at issue in *Baca* was a dangerous condition because it required security personnel to actively engage in dangerous conduct—requiring force to be employed without first being allowed to investigate whether ejectment was warranted beforehand. It is enough to say that the policies identified by Plaintiff do

---

[6] The Court's reading of *Upton* is further reinforced by the fact that NMTCA waiver provisions are based on traditional negligence principles, which require a plaintiff to prove causation. *Romero v. Giant Stop-N-Go of New Mexico, Inc.*, 212 P.3d 408, 410 (N.M. Ct. App. 2009) ("It is axiomatic that a negligence action requires that there be a duty owed from the defendant to the plaintiff; that based on a standard of reasonable care under the circumstances, the defendant breached that duty; and that the breach was a *cause in fact* and *proximate cause* of the plaintiff's damages." (emphasis added)); *see also* N.M. Stat. § 41-4-2(B) ("Liability for acts or omissions under the Tort Claims Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty."); *Encinias*, 310 P.3d at 618 ("the facts of a case will support a waiver under Section 41-4-6(A) if they would support a finding of liability against a private property owner."); *c.f. Lujan v. New Mexico Dep't of Transp.*, 341 P.3d 1, 4 (N.M. Ct. App. 2014) (interpreting another section of the NMTCA to require a plaintiff to prove proximate cause).

not require SCC staff to abandon their discretion or *actively* engage in conduct that risks injuring SCC inmates. For that reason, the Court concludes that *Baca* is distinguishable.

### 3. Recent Decisions in the District of New Mexico

Since this lawsuit was filed, three other judges in this District have decided motions to dismiss involving facts and issues similar to the case at hand. Tellingly, each case reinforces the proposition that, for Section 41-4-6 to apply, the plaintiff must have alleged that the government had at least some prior notice of the risk at issue.

In *Thorn-Freeman v. Valdez*, Civ. No. 20-448 JAP/GJF, 2020 WL 5369063, at *1 (D.N.M. Sept. 4, 2020), Thorn-Freeman alleged that Officer Valdez repeatedly entered her cell and sexually assaulted her. Thorn-Freeman argued that the following allegations brought her claim within Section 41-4-6's waiver: "(1) video cameras recorded Defendant Valdez entering Plaintiff's cell five times over the course of a week, (2) Defendant Valdez violated [prison] policy by entering Plaintiff's cell, and (3) there ha[d] been numerous recent complaints of sexual assault at [the prison]." *Id.* at *7. Judge Parker found Thorn-Freeman's allegation regarding recent accusations to be irrelevant to "the issue of whether [d]efendants created a dangerous condition that led to the assault on" Thorn-Freeman. *Id.* at *10. Instead, Judge Parker emphasized that the proper analysis "requires allegations of *prior instances* of misconduct," not prior *allegations* of misconduct. *Id.* (emphasis in original). Judge Parker held that Thorn-Freeman failed to establish the existence of a dangerous condition because she did not allege that any of the defendants "had information that [she] (or any other inmate) was at an increased risk of sexual assault, ignored that risk, and then failed to respond after the assault occurred." *Id.*

In *Green v. Padilla*, No. CIV 19-0751 JB\JFR, 2020 WL 5350175, at *1–2 (D.N.M. Sept. 4, 2020), three female inmates at the SCC alleged that they were sexually abused by prison guards.

Plaintiffs argued that the defendants did not enjoy sovereign immunity "because they maintained a dangerous condition at" the SCC. *Id.* at *8. Plaintiffs made the following pertinent allegations: (1) defendants "continued to employ correctional officers with *known* proclivities to sexually abuse and assault female inmates, and whom the [defendants] continued to permit access to female inmates;" (2) defendants "routinely ignored female inmates' complaints about correctional officials' misconduct, intimidating female inmates from reporting misconduct and retaliating against female inmates who did report misconduct;" and (3), the SCC "did not install security cameras in areas where assaults frequently occurred, and that [the SCC] was consistently understaffed such that male correctional officials frequently were alone with female inmates." *Id.* at *46 (emphasis added). Viewing all allegations as true, Judge Browning held that Section 41-4-6 did not bar the plaintiffs' claims because the defendants "*should have known*" that the guard defendants presented a risk to the prison population at large. *Id.* (emphasis added).

Last, in *Gilman v. New Mexico*, Civ. No. 20-213 KG/SCY, 2020 WL 5603485, at *1 (D.N.M. Sept. 18, 2020), plaintiff Gilman was escorted to her cell late at night by a corrections officer who then entered her cell and sexually abused her. Gilman alleged that the officer knew that her cell was not being monitored by camera when he assaulted her. *Id.* Gilman further alleged that the following policies exposed the entire inmate population to a risk of sexual abuse:

> [a] setting staffing plans that did not comply with relevant standards, guidelines, and policies for protecting inmates from the risk of sexual abuse, particularly during night shifts; [b] failing to staff the facility with a number of corrections officers and female corrections officers that would be reasonably necessary to protect inmates from the risk of sexual abuse, particularly during night shifts; [c] failing to monitor real time video feeds of the facility during night shifts; [d] allowing male corrections officers to escort inmates throughout the facility during night shifts, without being observed by a third party; [e] allowing male corrections officers to enter housing units during night shifts, without being observed by a third party, and without announcing themselves; and [f] allowing male corrections officers to view inmates in their cells as they showered or changed clothes during night shifts, without being observed by a third party.

*Id.* at *2. Notably, Gilman alleged that "[t]hese customs, policies, and/or practices were contrary to State and national standards, guidelines, and policies for protecting inmates from sexual victimization." *Id.* Judge Gonzales reasoned that a trial court could "reasonably infer that Defendant State of New Mexico *reasonably should have known* about the alleged unsafe night conditions, including the lack of monitoring, and could have prevented the harm" the officer caused her. *Id.* at *4 (emphasis added). Given that inference, Judge Gonzales concluded that Gilman had pled sufficient facts to show that Section 41-4-6 applied to her claims. *Id.* at *5.

The instant case features allegations significantly thinner than any of these cases. Like *Thorn-Freeman* and unlike *Green*, Plaintiff has not alleged that Defendant Whited had engaged in prior instances of sexual misconduct with inmates—or that the State Defendants knew or should have known of any such misconduct. *Compare Thorn-Freeman*, 2020 WL 5369063, at *10, *with Green*, 2020 WL 5350175, at *46–47. And in contrast to *Gilman*, the perpetrator of the assault was not a correctional officer. Defendant Whited as an administrative staff member—working in the business office—was not expected to have routine or significant contact with inmates. *See* ECF 46 ¶ 18–20. Accordingly, the notion that State Defendants should have known that Defendant Whited posed a risk to female inmates is considerably more dubious than if he was a correctional officer. Moreover, there is a difference in the types of policies involved in the two cases. In *Gilman*, the relevant policies arguably should have raised red flags about the risk of sexual assault to inmates—for example, "allowing male corrections officers to view inmates in their cells as they showered or changed clothes during night shifts, without being observed by a third party." *Gilman*, 2020 WL 5603485, at *2. Importantly, the policies involved in *Gilman* were alleged to be contrary to state and national guidelines designed to protect "inmates from sexual victimization." *Id.* And Plaintiff does not allege in the instant case that the SCC's staffing policies violated similar types

of guidelines or standards. *See* ECF 46 ¶¶ 12–13. Although Plaintiff's PREA allegations give the Court some pause, she has not plausibly alleged that State Defendants should have known that punishing inmates who made *unsubstantiated* PREA complaints put inmates at an increased risk. *See* ECF 46 ¶¶ 33–37.

The Court will end with an observation. The law of Section 41-4-6—as applied in the prison context—is in flux, with the most recent decisions coming from the federal judiciary. Given the significant differences between the facts of this case and those of the recent cases cited herein, however, this Court is constrained to hold that the allegations brought in the First Amended Complaint do not fall within the scope of Section 41-4-6. Because Defendant Whited worked in the business office and was not a correctional officer, there was no expectation that he would have routine interactions with inmates. In addition, Plaintiff did not allege that Defendant Whited had a predatory tendency or was inclined to harass inmates, much less that prison officials knew or should have known of any such tendency. Moreover, the First Amended Complaint was silent as to any broader allegation that SCC administrative staff (as opposed to correctional officers) had a history of preying on female inmates. Nor was there any allegation that the supply closet in question was a "hot zone" for sexual assaults. *See Encinias*, 310 P.3d at 618–19. Simply put, Plaintiff did not plausibly allege that State Defendants were on notice that Defendant Whited presented any danger to the female inmate population. Unless and until the New Mexico Supreme Court suggests that Section 41-4-6 applies to a fact pattern like the instant case, this Court must hold that cases with factual allegations like the ones made here fall outside the scope of Section 41-4-6.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that State Defendants' Motion is

**GRANTED**.

**IT IS FURTHER ORDERED** that Count V of the First Amended Complaint [ECF 46]

is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***